## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

UNITED STATES OF AMERICA,

                **Plaintiff,**

vs.

LAROHNDA DENNISON,

                **Defendant.**

**MEMORANDUM DECISION
AND ORDER**

**Case No.  2:13CR805DAK**

**Judge Dale A. Kimball**

This matter is before the court on Defendant LaRohnda Dennison's Motion to Dismiss the Indictment.  Defendant seeks dismissal of the Superseding Indictment based on the government's loss of evidence that is potentially favorable to Defendant.  The court held a hearing on the motion on December 4, 2014.  At the hearing, Defendant was present and represented by Tara L. Isaacson and Walter F. Bugden, Jr., and the United States was represented by Mark Y. Hirata, Kaye Lynn Wootton, and Robert C. Morton.  Now being fully advised, the court enters the following Memorandum Decision and Order.

### BACKGROUND

Defendant is charged with eleven counts of health care fraud and eleven counts of false statements relating to health care matters.  Defendant, along with her mother and brother, owned and operated Westview Community Health Center, Inc. from 2004 to 2010.  Westview was a women's medical clinic offering prenatal, labor and delivery, postpartum, and pediatric care services.

Patients at Westview paid for services through insurance, private payment, or government-sponsored health care.  Defendant is charged with a scheme to defraud the Medicaid program by means of false and fraudulent pretenses and representations between 2005 and 2010. The United States alleges that Defendant used false pretenses to qualify illegal aliens for Medicaid's Baby Your Baby ("BYB") program to receive payment from the Medicaid program for prenatal care services.  Only United States citizens and resident aliens qualify for Medicaid's BYB program.

The government further alleges that Sandra Hernandez, a medical assistant and office administrator at Westview, and others acting under Defendant's command, directed and coached pregnant aliens to apply for BYB benefits.  Hernandez has pled guilty to a one-count felony information for health care fraud and is now cooperating with the government.  Defendant denies any involvement in or knowledge of patients being coached into false applications for benefits.

On August 10, 2010, the Utah Attorney General's Office executed a search warrant at Westview.  The Intermountain West Regional Computer Forensics Laboratory ("IWRCFL") assisted with the search by providing on-site forensic examiners.  The forensic examiners obtained forensic images of all of Westview's servers, computers, and other digital media.  There were approximately 30 working computers at Westview.  The forensic images were transferred to 20 hard drives.

At the conclusion of the search, the hard drives were turned over to the Attorney General's office.  The computers and other digital media from which digital media was copied during the search were not seized or taken off-site.  The imaging took place on site and the computers and other digital media sources remained at Westview following the August 18

2

search.

Within a few days of the Westview search, the Attorney General's office transferred custody of the 40 hard drives to IWRCFL for further processing, which included the facilitation of the government's ability to review the forensic images contained on the hard drives.  Forensic Examiner ("FE") Bell processed the data and successfully transferred forensic images from 19 of the 20 hard drives onto a Storage Area Network ("SAN").  One of the hard drives failed or malfunctioned and the data on it could not be accessed or copied.  Following the transfer of the forensic images from the hard drives to the SAN, the hard drives were forensically "wiped."

FE Bell proceeded to process the forensic images using forensic software and subsequently made those images available to the lead investigator, Agent Skinner.  The review of images by Agent Skinner or his designee included selection of a particular computer item, a review of the files within those images, and a checking of files of interest.  FE Bell then bookmarked all files checked by Agent Skinner, which he preserved in a digital report.  FE Bell ultimately provided the information to Agent Skinner on a CD.

The review by Agent Skinner, the preservation of the checked files, and the production of the CDs occurred from September 2010 to June 2012.  Three CDs were filled with information from that review process.  Agent Skinner provided that information to the government, and the government provided that information in discovery.

FE Bell also copied the forensic images from the SAN to a hard drive, labeled 10239-401 ("401").  Bell copied the images using the "drag-drop" method, which is a standard method of copying.  The process took several days due to the amount of data.  After completion of the copying process, Bell provided Agent Skinner with the 401.

During the government's production of computer evidence discovery in January 2014, it discovered that six items containing forensic images were not successfully transferred from the SAN to the 401. FE Bell was requested to review his file and prepare a report of his findings concerning the six missing items.

Following his review of the situation, Bell prepared a report that was provided to defense counsel on February 24, 2014. Bell's report confirms that one of the six items was not successfully transferred to the SAN because it could not be accessed due to a failed hard drive and that he did not know why the other 5 items did not successfully transfer. AUSA Mark Hirata submitted a letter addendum to Bell's report to defense counsel on May 9, 2014, including information about Bell's request for a backup copy of the SAN and IWRCL's failure to make such a copy because its server crashed. It was not standard operating procedures to make a back up copy, but the senior systems engineer stated that he generally made copies as a "best practices" procedure.

At a status conference before Magistrate Judge Furse on May 13, 2014, the defense expressed concern about the government's loss of evidence in reference to the six missing items. Magistrate Furse suggested that the parties meet to exchange information and determine whether the dispute could be resolved. The government set up a meeting at the IWRCFL offices. Bell and a former senior systems engineer appeared and provided explanations to counsel for defense counsel and AUSA Hirata.

Bell speculated three potential explanations for the six missing items: (1) a failure to communicate between the network and the SAN; (2) a power bump during the copy and transfer process; and (3) some other unknown reason that caused the data not to copy correctly. Bell

explained that when items fail to copy during the transfer process, an error notice typically pops up on the screen, but no such error notices popped up during the transfer process.  Bell also confirmed that neither he nor any other IWRCFL examiner intentionally destroyed or altered any computer data obtained during the Westview search.  The government also concedes that the six items may not have been transferred because of user error – Bell mistakenly thought he transferred the six items when he did not.

In January 2014, Agent Skinner transferred custody of the 401 back to the IWRCFL for the purpose of restoring images of the original evidence to the server for additional analysis and to assist with trial preparation.  IWRCFL FE Sean Drew was assigned to assist.

Agent Skinner attempted to have FE Drew assist with identifying the unique file path and name of various "core documents" contained on the three CDs previously created by FE Bell.  Such information would aid in establishing the existence of files on one or more computers at Westview on the day of the search.  During this process, FE Drew discovered that a file structure of images identified on the three CDs could not be matched up with the file structure images on the 401 using the same identifier.  Although some of the core documents from the three CDs were located on the 401, they were found in file structure images bearing a different identifier.  The government, therefore, is unable to trace many core documents on the three CDs to a particular Westview computer.

On September 15, 2014, the government emailed a letter to defense counsel explaining the situation and attaching a copy of an IWRCFL supplemental report.  The government advised the defense of its intent not to offer into evidence any files drawn from the search warrant computer data.  The government further advised that it would not object to the defense's use at

trial of any files drawn from the 501, 502, 503, or 401 provided in discovery.  The government also stated that it would file a motion in limine seeking an order prohibiting the defense from attempting to offer at trial any evidence pertaining to the government's imaging and processing of search warrant computer data.

After the search warrant was executed and the government withheld all benefit payments to Westview, Dennison had to close the clinic.  All of the computers remained at the clinic at that time.  However, after closing the clinic, Dennison did not have the ability to store all of the computers so she donated all but four of the computers to a local school.  The other four computers were briefly used by family members, but have since been given away as well.  By the time the Indictment was filed against her, Dennison was no longer in possession of any of the computers.  Therefore, the information on the computers cannot be accessed again.

## ANALYSIS

Defendant asks the court to dismiss the Superseding Indictment because of the government's loss of evidence favorable to her.  "[T]he Supreme Court has developed a framework to analyze 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993).  "'The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession.'" *United States v. Gomez*, 191 F.3d 1214, 1218 (10th Cir. 1999) (quoting *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994).[1]  Whereas *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) and

---

[1]  In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S.

*California v. Trombetta*, 467 U.S. 479 (1984) "'govern cases in which the government no longer possesses the disputed evidence.'" *Id.*

In this case, six of the computer hard drives are completely lost and the information contained on the remaining twenty-four has been corrupted to the point that it is not in a format that enables it to be used at trial. The government sent a letter to defense counsel explaining that the evidence could not be used at trial. Although that letter stated that Defendant could attempt to use the corrupted evidence at trial, it is unclear to the court how Defendant would be able to use it. Therefore, all the forensic computer evidence obtained through the search warrant is lost for purposes of trial. Because of the distinction between evidence still in the government's possession and evidence not in the government's possession, Defendant's claim must be analyzed under the *Trombetta/Youngblood* line of cases involving lost evidence.

As an initial matter, this case poses a unique question as to whether the government failed to disclose evidence. The government made copies of all the computers at Defendant's clinic and, through a serious of mistakes by its forensics lab, lost or corrupted all of the evidence contained on the computers. Meanwhile, Defendant, who knew that all the evidence had been copied by the government, disposed of all the computers in the three years between the execution of the search warrant and the filing of an indictment in this case. Although Defendant remained in possession of the computers after the search warrant was executed, she was forced to close her clinic shortly thereafter because the government withheld all Medicaid payments and she did not have the ability or means to keep the computers. The government claims it has no duty to

---

83, 88 (1963). Under *Brady*: "[t]he evidence at issue must be favorable to the accused; . . . that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 263, 281-82 (1999).

Defendant because it did not take the computers.  However, the government does not claim that it informed Defendant to keep the computers, and the court finds nothing unreasonable in Defendant's actions.  By the time the government filed the Indictment, the government was the only party in possession of the evidence.  As such, the government was under an obligation to disclose any evidence from the computers that would be favorable to Defendant.  This is not a case where disclosure would have been merely cumulative.

"In order to establish a due process violation under *Trombetta*, [Defendant] must show that the [computer] evidence had exculpatory significance that would have been 'apparent before' its destruction, and that is was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Gomez*, 191 F.3d at 1218. The Supreme Court "in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *U.S. v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) (citing *Youngblood*, 488 U.S. at 58).

Defendant asserts that the exculpatory and favorable nature of the lost computer data evidence is apparent.  The government, however, argues that Defendant's claims that the missing evidence had exculpatory value is conclusory and speculative.  The lost evidence includes all of the information contained on the clinic's computers for approximately five years, such as emails, memoranda, financial information, and other documents related to the operation of the clinic. This information was not kept in any other form in the clinic.

The amount of evidence lost in this case is substantial.  Although Defendant states that

she has some idea of the information contained on the computers, she contends that it is impossible to identify all of the evidence favorable to her that has been lost by the government.

Defendant claims and the government does not appear to dispute that two of the lost computers were used extensively by Hernandez, her co-defendant who is now a cooperating witness for the government.  Hernandez initially told police she was acting on her own when she coached patients to lie about their immigration status.  After retaining counsel, Hernandez began to claim that Defendant was aware of the coaching.  One of the central theories of the government was that at the point of being checked in, patients were coached and given documents in Spanish to help them to deceive the Utah Department of Health and that the process was directed by Defendant.  In particular, that a document containing information about BYB was given to patients in Spanish.  The computer in Room "A" was used by Hernandez and others in the reception area.  Defendant claims that the computer in Room "A" would contain versions of documents created, modified, or used by Hernandez and could demonstrate her control over the intake process.  Defendant also argues that this computer would show that Defendant had no involvement, especially since all of the documents are in Spanish and Defendant does not speak Spanish.  Defendant contends that documents on the computer in Room "A" could have been used to impeach Hernandez and show her control over the intake process and creation of the document in question.

Defendant also asserts that information contained on the Computer in Room "G," which was Hernandez's office for some years, would have been favorable to her defense.  Defendant claims that this computer would contain documents in Spanish developed and updated by Hernandez and would show her generation of documents that the government alleges were part

9

of the scheme and artifice to defraud.  Defendant argues that she had no involvement with qualifying patients for BYB and the office records would support her claims.

Defense counsel claims that it could have used data contained on the computers to demonstrate affirmatively that Defendant was not involved in the BYB process and to impeach Hernandez's testimony.  Impeaching Hernandez's testimony would be favorable to Defendant because she is an important government witness.  Because the government lost or corrupted that evidence, Defendant is unable to use any of the office records for purposes of impeachment and, therefore, her ability to mount a meaningful defense is compromised.

Defendant further contends that the missing computer data could have been used to impeach other government witnesses. Defendant states that the information on computers used by physicians, such as Dr. Agresta, Dr. Susanka and Dr. Nguyen, who are expected to testify for the government is necessary in her ability to impeach their testimony. The doctors are expected to offer criticism and testimony about how the clinic was operated.  Defense counsel asserts that it cannot contradict this testimony without documents from the doctor's computers, including emails, memoranda and clinic records, which could be used by the defense to impeach and question the motives of these witnesses

The government also alleges that the ultrasound technician employed by Westview was not properly supervised when he performed ultrasounds.  Dr. Susanka, a former employee at Westview, will testify that Dr. Tanner, another physician at Westview, was employed to review ultrasounds.  Dr. Tanner will deny that he was reviewing ultrasounds. Dr. Susanka's computer was in room "V."  Defense counsel argues that it needs files from that computer to confirm Dr. Susanka's testimony and to impeach Dr. Tanner's testimony.  Without the computer evidence, it

becomes a situation of he-said, she-said with no means of supporting either position.

Defendant argues that the above examples are just a sample of how the computer evidence in this case would be favorable to the defense. Defendant contends that her assumptions as to what would have been on the computers are examples to show that the missing computer evidence contained potentially exculpatory evidence.

The court disagrees with the government that Defendant has provided only speculative or conclusory arguments that the evidence is exculpatory. In a case involving the operation of a clinic, the day-to-day office records and communications are obviously critical. Defendant has clearly pointed to the loss of evidence regarding Hernandez's creation of important documents in the alleged scheme to defraud. Defendant has also detailed several instances in which her ability to cross-examine government witnesses is prevented by not having the information contained on the computers. Even on issues in which Defendant has a witness supporting her claims, she is left with no documents to corroborate the testimony favorable to her position. As such, this documentary evidence is not cumulative. It is necessary for impeachment of critical government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule.") "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The court finds that if the lost computer evidence was available to the defense, there is a reasonable probability that it could impact witness credibility and ultimately change the outcome of the trial.

From the moment the government sought and obtained a search warrant for the

information, the government should have been aware of the critical nature of this evidence both

for its own case and for Defendant's defense.  Given the substantial loss of evidence–a business's

entire day-to-day records and communications over the course of  many years–the court finds it

impossible to conclude that it was not apparent that there would be favorable or useful evidence

to Defendant on the clinic's computers.  The need for documentary support for Defendant's

defense is obvious.  This is not a case where one or two documents have been lost and Defendant

needs to demonstrate how those documents would have been apparently favorable.  The

government's loss of evidence in this case has left Defendant with no documentary evidence at

all.  Therefore, under *Trombetta*'s first element, the court finds that the exculpatory significance

of the clinic's computers was apparent before the evidence's destruction.

Under *Trombetta*'s second element, Defendant must demonstrate that she remains unable

to "obtain comparable evidence by other reasonably available means."  *Bohl*, 25 F.3d at 910.

While the government argues that the evidence on the computers is not central to its own case, it

fails to appreciate that such evidence is critical to Defendant's ability to mount a meaningful

defense.  The loss of evidence should not result in the government being able to put on witnesses

without any documents available to challenge their testimony.  As stated above, Defendant is left

with no day-to-day records or communications with which to impeach the government's

witnesses.  In addition, in the situation where there are competing witnesses, there are no

documents to corroborate one witness's version of the facts or to call into question a witnesses'

motives.  Witness testimony alone cannot take the place of the documentary evidence at the

clinic. There is no other comparable evidence to a business's entire day-to-day records and

communications when the charges involved relate to the operation of the business.  Accordingly,

the court concludes that Defendant has met *Trombetta's* second element.

As explained by the Tenth Circuit in *Bohl*, a due process violation occurs under *Trombetta* without a finding of bad faith. 25 F.3d at 910. *Youngblood*, which requires a finding of bad faith, merely extends the possibility of finding a due process violation to evidence that has an indeterminate exculpatory value. Because the court has found that the exculpatory value of the clinic's records was apparent before the evidence was lost, there is no need for Defendant to demonstrate, or for the court to find, bad faith on the part of the government.[2] The court concludes that the circumstances in this case present a due process violation. Accordingly, the court grants Defendant's Motion to Dismiss the Indictment.

## CONCLUSION

Based on the above reasoning, Defendant's Motion to Dismiss the Indictment is GRANTED.

DATED this 11th day of December, 2014.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[2] Although not necessary, the court notes that it finds no bad faith on the part of the government. The court recognizes that the forensics lab encountered a series of unfortunate errors or mistakes that were entirely unintentional. Government's counsel acted ethically and professionally in response to those problems.